**Electronically Filed
Intermediate Court of Appeals
CAAP-12-0000518
31-OCT-2014
09:43 AM**

CAAP-12-0000518

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee,
v.
BRANDON K. KAHAI, Defendant-Appellant.


APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CR. NO. 09-1-0093(1))


MEMORANDUM OPINION
(By: Nakamura, C.J., and Fujise and Leonard, JJ.)


Plaintiff-Appellee State of Hawai'i (State) charged Defendant-Appellant Brandon K. Kahai (Kahai) by indictment with first-degree sexual assault by strong compulsion (Count 1), third-degree sexual assault by strong compulsion (Counts 2 and 3), kidnapping with intent to inflict bodily injury or subject the alleged victim to a sexual offense (Count 4), and second-degree assault (Count 5). The complaining witness (CW) for all the charged offenses was Kahai's cousin.

After Kahai was arrested, he waived his Miranda rights and confessed to the police. In his confession, Kahai stated that he went drinking with the CW at the Ale House, and they were joined by the CW's friend. While with the CW, Kahai became sexually aroused. After going to the Watercress Lounge and closing it down, the CW's friend went home, and Kahai and the CW went to his house to drink some more. Kahai stated that at his house, the CW began "flipping out" and decided to walk home.

After the CW left, Kahai got into his car and went to look for her. He saw her walking on the road, got out of his car, and decided to "capitalize," with his primary focus being to "just get it." Kahai walked up to the CW and struck her in the face, causing her to fall backward and hit the pavement. The CW was semi-conscious and moaning. Kahai dragged the CW into the brush area. Kahai admitted that he removed the CW's clothes and sexually assaulted her. During the sexual assault, the CW was non-responsive and her eyes were closed. Kahai left the CW naked at the scene and ran to his car. Kahai drove home and changed his clothes, leaving his shorts on the garage floor and his two shirts near the washing machine. Kahai stated that the incident was "eating at him inside," so he went back to the scene where he was stopped by the police and arrested.

Kahai moved to suppress his confession as the fruit of an unlawful arrest (Motion to Suppress Confession). The Circuit Court of the Second Circuit (Circuit Court)[1] denied the motion. The Circuit Court also denied Kahai's motion to reconsider the denial of the Motion to Suppress Confession (Motion for Reconsideration).

Pursuant to a plea agreement, Kahai entered a conditional plea of no contest to all the charges, reserving the right to appeal the Circuit Court's denial of his Motion to Suppress Confession. The plea agreement included the parties' agreement to the imposition of concurrent sentences of twenty years as to Count 1, ten years as to Count 4, and five years as to Counts 2, 3, and 5. The Circuit Court agreed to follow the parties' sentencing agreement in accepting Kahai's no contest plea. In sentencing Kahai, the Circuit Court imposed the agreed-upon sentences as to Counts 1, 2, 3, and 5. However, the Circuit Court sentenced Kahai to twenty years of imprisonment on Count 4, instead of the agreed-upon ten years. The Circuit Court entered its Judgment on April 27, 2012.

---

[1] The Honorable Joel E. August presided.

On appeal, Kahai raises two points of error. First, Kahai argues that the Circuit Court erred in denying his Motion to Suppress Confession.[2] Kahai contends that the police lacked probable cause to arrest him, that his arrest was therefore unlawful, and that his confession should have been suppressed as the fruit of an unlawful arrest. Kahai also challenges certain findings of fact and conclusions of law made by the Circuit Court in support of its order denying Kahai's Motion to Suppress Confession. Second, Kahai argues that the Circuit Court erred in sentencing him to twenty years of imprisonment on Count 4, in violation of its agreement to bind itself to the parties' sentencing agreement.

As explained in greater detail below, we hold that the police had probable cause to arrest Kahai. Accordingly, Kahai's confession was not the fruit of an unlawful arrest, and the Circuit Court properly denied Kahai's Motion to Suppress Confession. As to Kahai's sentencing claim, the State concedes that the Circuit Court erred in sentencing Kahai to twenty years of imprisonment on Count 4. We agree with the State's concession of error. Accordingly, we vacate Kahai's sentence on Count 4, and we remand the case with directions that the Circuit Court impose a ten-year term of imprisonment on Count 4, consistent with its agreement to bind itself to the parties' sentencing agreement. We affirm the Circuit Court's Judgment in all other respects.

BACKGROUND

I.

The following evidence was adduced at the hearing on the Kahai's Motion to Suppress Confession.

---

[2] Kahai also contends that the Circuit Court erred in denying his Motion for Reconsideration. However, he raises the same arguments in contesting the denial of his Motion for Reconsideration as he does in contesting the denial of his Motion to Suppress Confession. We therefore will not separately address the Circuit Court's denial of the Motion for Reconsideration.

On February 9, 2009, at approximately 2:35 a.m., Maui Police Department officers were dispatched to a Wailuku residence to investigate a report of a hysterical female with blood on her hands. Three officers, Terrence Gomez (Officer Gomez), Denton Galarza (Officer Galarza), and Heather Gilroy (Officer Gilroy) were assigned to the investigation.

Upon arriving at the residence, the officers encountered the CW, who had sustained a head wound and had a large amount of dried blood, as well as grass, dirt, and leaves, in her hair. The CW was only wearing a T-shirt, was not wearing any clothes or undergarments from the waist down, had a sheet wrapped around her waist, and was barefoot. The CW seemed shaken up and was crying off and on. She also appeared to be intoxicated and disoriented. She slurred her words and had a strong odor of liquor.

Officer Galarza interviewed the CW. The CW was unable to provide Officer Galarza with much detail about what had happened. She just knew she had been attacked. Officer Galarza testified that the CW recalled hiding in some bushes at Waiehu Beach and being attacked and punched by an unknown person. When asked if she had been drinking, the CW initially denied having anything to drink, but later said she had been drinking by herself at her residence. Officer Galarza continued to question the CW because he did not believe these statements to be true. The CW eventually stated that she had been out earlier that evening with her friend, K.T., and her cousin, Kahai; that they had been drinking at the Ale House; that she later caught a ride home with K.T. and Kahai in K.T.'s car; and that after being dropped off, she went for a walk and ended up by the Waiehu Cemetery, where she was attacked. The CW later said she had not been dropped off at home. Officer Galarza noted that the CW was "really disoriented, kept giving us different -- kept adding on. She couldn't remember everything."

Officer Gomez testified that he conferred with Officer Galarza after Officer Galarza interviewed the CW, and that

4

Officer Galarza relayed the information Officer Galarza had received from the CW. Officer Gilroy took the CW into the bathroom to look at her injuries. Officer Gilroy observed a large laceration on the back of the CW's head, a large abrasion consistent with a "rug burn" or "road rash" near her tail bone, and abrasions to both elbows. The CW also complained of pain to her left jaw area and said she had been struck there. The CW denied being sexually assaulted.

After interviewing the CW, Officer Galarza proceeded to K.T.'s residence, which was nearby. K.T. stated that she met the CW and Kahai at the Ale House; that at about 9:30, the CW and Kahai left together in Kahai's vehicle; and that K.T. left in her vehicle and went home.

Officer Galarza obtained Kahai's residence address though a license check. At approximately 4:00 a.m., Officer Galarza arrived at Kahai's residence, with the intention of questioning him as a possible witness to the CW's attack. Officer Gomez arrived several minutes later. The carport light was on and a vehicle registered to Kahai was parked in the carport, but the lights in the residence were off. On the floor of the carport, the officers noticed a pair of shorts. The shorts had dirt on them and appeared as if "they were stepped out of." The officers also noticed a white T-shirt and a tank top hanging over a utility sink about an arm's length distance from the shorts. The T-shirt had dark red stains on it that appeared to be blood. The officers knocked on the door to the house and on the walls around the house, but no one responded.

While at Kahai's residence, Officer Gomez called the CW's father and was informed that the CW was now saying she possibly had been sexually assaulted. Officer Gomez and Officer Gilroy drove to the CW's father's residence. Officer Gilroy interviewed the CW. The CW stated that after her father drove her home from where the police had earlier interviewed her, she took a shower. The CW stated that she believed she had been sexually assaulted because she was menstruating and after her

shower, she realized that her tampon "was shoved all the way up there."  Although the CW still had difficulty remembering what had happened, she told Officer Gilroy that Kahai drove her to the Ale House where they met K.T.  They subsequently went to the Watercress Lounge for more drinking.  Kahai then drove the CW to Kahai's house.  K.T. was no longer with them, and the CW stated she felt uncomfortable.

The CW told Officer Gilroy that the CW left Kahai's house and walked down Kahekili Highway.  While in the area of Waiehu Beach Road and Lower Waiehu Beach Road, the CW was attacked.  All the CW could remember was being shoved down and someone on top of her.  She was unsure of who the responsible person was and exactly where the attack occurred.  She was also unsure if a sexual assault had taken place, but said that "it felt to her like it did."  Although the CW indicated that she was not sure who was responsible for the attack, she stated several times, "It must have been Brandon."

Although Officer Gomez did not hear Officer Gilroy's interview of the CW, Officer Gomez testified that he was working in concert with Officer Gilroy, and Officer Gilroy related to Officer Gomez what the CW had said.  Officer Gilroy told Officer Gomez that Kahai was the suspect.  Officer Gomez testified that at the CW's father's house, Officer Gilroy told him the CW said that she was unsure who the responsible person was and exactly where the assault happened; that the CW possibly had been sexually assaulted and that "she was menstruating and her tampon was shoved up there"; that the CW believes or suspects that Kahai was the perpetrator; and that the incident may have happened on Lower Waiehu Beach Road.  Officer Gomez testified that the CW seemed more calm and coherent at her father's house than a couple of hours earlier when he first saw her.

Based on the information he had received, Officer Gomez left the CW's father's house and drove towards Waiehu Beach Road to investigate.  Near the Church of Christ on Waiehu Beach Road, Officer Gomez saw a women's high-heel shoe on the shoulder of the

6

road.   Upon stopping to investigate, Officer Gomez found a matching shoe.   About ten feet from the second shoe, Officer Gomez saw a puddle of blood that was still in liquid form.   In the area of the puddle of blood, there was a trail down a hill, leading into some bushes and brush.   Officer Gomez went down the trail and saw what appeared to be blood, still wet, on a flattened cardboard box and on a piece of carpet.   On the carpet, he found a pair of jeans and female underwear connected to the jeans that were inside out, as if they had been "rolled off" someone.   Officer Gomez described the area as having lots of debris, shredded wood, leaves, and dirt, similar to the debris he had seen stuck to the CW's bloody hair earlier that morning.

While waiting for an evidence technician to arrive at the scene, Officer Gomez noticed a white four-door Ford pass by with a male driver.   This car and driver stood out because the driver matched the description of Kahai, the car was going "too slow" for the morning traffic, and the driver kept staring and looking at the police without paying attention to the road.   The car also matched the description of a car belonging to Kahai's mother.   Officer Gomez attempted to have another officer stop the car, but it had already passed.

A short time later, Officer Gomez saw the same car come back to the scene, approaching from the opposite direction.   By this time, Officer Gomez had obtained the license plate number for Kahai's mother's vehicle.   Officer Gomez effected an investigative stop of the car to identify the driver.   As Officer Gomez approached the car, he noticed the driver was very nervous. The driver was shaking, clenching the steering wheel, and sweating profusely.   Officer Gomez confirmed that the driver was Kahai, and then Officer Gomez placed Kahai under arrest, with sexual assault being the most serious crime for which Kahai was arrested.

II.

A.

At the close of the hearing, the Circuit Court orally denied Kahai's Motion to Suppress Confession and made the following pertinent findings:

> By 7:50 in the morning when defendant was arrested the police knew the following, or had reasonably trustworthy information concerning the following.
>
> Number one, that [the CW] had been the victim of an assault at about 2:30 that morning. And when they interviewed her shortly thereafter, she had blood -- a significant amount of blood, grass and dirt on her hair. There was actually even blood, if you look at the police report, on the sheet that she was holding around her.
>
> She was basically naked from her waist down, but there was still blood flowing on to the sheet that was surrounding her.
>
> The police knew that the victim believed that the assault had occurred somewhere along the side of the road in Waiehu. The police knew that the last person who the victim had last been seen with that night was the defendant. And knew or believed, reasonably believed that he had driven the victim from a bar where they had been drinking to his home in Waiehu.
>
> They knew, according to the victim, that she had apparently left the defendant's home when it's pitch black, sometime early in the morning because she was feeling uncomfortable at his house. In other words, something occurred there such that she left and went off into the night on her own. And they certainly didn't have any reason to believe that the defendant had driven her somewhere as he had driven her to his house.
>
> When the police arrive at the defendant's home at about 3:50 that morning, a time when most people are home in bed, they find the defendant's car in the driveway. They see lights on in the carport, but no lights on in the house. And nobody was observed to be at the house.
>
> And in the carport they find a pair of man's shorts with grass on them, as if somebody had just stepped right out of them. They were on the floor of the garage, the carport. They find a white T-shirt and tank top which had what appeared to be fresh blood stains on them. And the police seize the shorts and the blood sustained T-shirt as evidence of the crime committed against [the CW]. . . .
>
> At approximately 4:50 a.m., about an hour later, Officer Gilroy is interviewing the victim after she had showered, and apparently had come to the conclusion that she had not only been physically assaulted by being hit on the head, but in all likelihood was sexually assaulted because of the location of her tampon.

8

And while not sure who the attacker was, the victim states several times that it must have been the defendant.

Shortly after that, the police find the victim's shoes, pants and underpants --

. . . .

. . . Well, they find along Waiehu Beach Road a pair of levis or jeans with underwear on them and a pair of shoes. And they certainly know that the victim did not have any clothing on below her waist and was barefoot. And they find them near the church on Waiehu Beach Road which, at least formed to a reasonable person that that is likely the scene of the crime.

Aside from that, they also find blood, fresh blood in the area where the clothing is, which also is corroboration that that's the likely place where the victim was assaulted.

In the Court's view, looking at the totality of the aforementioned facts and circumstances, it would lead a person of reasonable caution to believe that the defendant was involved with the assault which had been perpetrated against [the CW]. And would have provided probable cause for his arrest at the time he was arrested.

B.

The Circuit Court memorialized its decision to deny Kahai's Motion to Suppress Confession it its written "Findings of Fact, Conclusions of Law, and Order Denying Defendant's Motion to Suppress Evidence," which provided in relevant part:

<u>FINDINGS OF FACT</u>

1. On February 9, 2009, at approximately 2:35 a.m., Officers Denton Galarza and Terrence Gomez were assigned to respond to a Wailuku residence where an adult female was reported to have injuries on her person. Upon arrival, the officers immediately observed that the above female had a large laceration in the back of the head, with a large amount of blood matted within her hair along with grass, dirt and leaves. She also had visible injuries to her elbows, and a large abrasion near her tail bone, and complained of pain to her jaw area, and elbows.

2. The female, who was later identified as [the CW], was visibly upset, crying and shaking. She also appeared extremely disoriented with a strong odor of liquor coming from her breath and was only wearing a dark stretched tank top. Other than the tank top and a bed sheet draped around her bottom, [the CW] was naked from the bottom down, and had no other clothing or footwear. The bed sheet had stains and spots that appeared to be blood.

3. At that time, [the CW] could only remember hiding in the bushes by Waiehu Beach Road and being attacked and punched by an unknown person in her jaw. Upon further

9

questioning, she was able to inform the officers that she had been out earlier that night with her friend [K.T.] and Defendant Brandon Kahai, who was her cousin. [The CW] did not remember any details of that evening except that she had been drinking at the Ale House in Kahului with the above two people and was later dropped off by them and subsequently attacked by an unknown person when she went for a walk on Waiehu Beach Road.

4. Officer Galaraza [sic] contacted [K.T.] and was able to confirm that [the CW] had been with her and Defendant earlier that evening and that she left [the CW] with Defendant in his vehicle. Although it wasn't true, [K.T.] also informed the officer that neither [the CW] or Defendant was intoxicated at that time. Pursuant to a license check, police learned that Defendant resided at [a specified address] in Wailuku.

5. At approximately 3:50 a.m., Officer Galarza with two other officers arrived at Defendant's above residence. Based on the above information, Defendant was not a suspect at that time. As with [K.T.], police were seeking to find out if Defendant could provide any information pertaining to [the CW]. Moreover, it was not the intention of the police to conduct a search of Defendant's residence for evidence.

6. As Officer Galarza entered onto Defendant's property, he observed Defendant's vehicle parked within the driveway. He noticed that the open carport's lights were on and that the house remained in darkness. As he approached the front door located within the carport, he observed, in plain view, a pair of men's gray shorts lying on the ground as if someone had stepped out of them. Officer Galarza also noticed, in plain view, a white t-shirt and tank top hanging from a utility sink approximately five feet away from the front door. The t-shirt and tank each had dark red stains which resembled dry blood.

7. At about 4:40 a.m., police spoke with [the CW] further and learned that [the CW] believed she had been sexually assaulted by the perpetrator because she was menstr[u]ating and uses tampons but now noticed that the tampon had been "shoved all the way up there". [The CW] stated she was not sure who the responsible was but stated that "it must have been Brandon", and that she had been at his house with him, then proceeded to walk home, where upon she was attacked in the area of Waiehu Beach Road and Lower Waiehu Beach Road.

8. At about 5:45 a.m[.], police went to Waiehu Beach Road and Lower Waiehu Beach Road, to look for evidence in connection with the attack on [the CW]. Upon arrival they observed a woman's high heel shoe on the roadway, another high heel shoe and a pool of blood on the driveway leading to Church of Christ, 810 Waiehu Beach Road, Maui, Hawaii. In addition, police located a pair of "inside out" denim jeans and female underpants on a trail just west of the Church. Furthermore, police observed in the brush area, more red fluid resembling blood on a white cardboard flattened box and carpet.

10

9. Police noticed that the area where the items were located contained a lot of debris, wood, shredded wood, leaves, and dirt. The debris at this location was consistent with the type of debris observed on [the CW] that morning.

10. While securing the scene, police observed a male matching the description of Defendant driving a white Ford sedan pass the scene. Police learned that Defendant's mother owned a white 2008 Ford sedan, with Hawaii License Plate [**W-**5], which was the same vehicle the Defendant was seen driving.

11. At about 7:50 a.m., police again observed the Ford Sedan traveling North on Waiehu Beach Road. At that time, police stepped into the roadway, and stopped the vehicle. Defendant Brandon Kahai was the lone occupant. He was immediately advised of his rights, acknowledged same, and was then placed under arrest for sexual assault, and taken to the Wailuku Police Station.

12. At all times during the entire investigation, police were acting in concert by communicating with each other via police radio and in person[.]

13. The Court finds the testimony of Officer Denton Galarza and Officer Terrence Gomez to be credible.

14. The Court finds credible the facts contained in Officer Heather Gilroy's police report, which was stipulated into evidence by the parties.

## CONCLUSIONS OF LAW

1. A search or an arrest without a warrant is valid only where an officer has probable cause to believe a crime is being, was, or is about to be committed. State v. Delmondo, 54 Haw. 552 (Haw. 1973);

2. Probable cause has been established when it can be said that a reasonable person viewing the evidence would have a strong suspicion that a crime had been committed. Id.

3. A law enforcement officer has probable cause to make an arrest when the facts and circumstances within the officer's knowledge and of which the officer has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that a crime has been or is being committed. Haw. Rev. Stat. § 803-5(b) (1993).

4. Probable cause to believe that the accused committed the offense with which he is charged is not equivalent to a belief that he is guilty beyond a reasonable doubt, and a distinction must be drawn between the evidence required in each situation. State v. Cannon, 56 Haw. 161, 163 (Haw. 1975).

11

5.    What is known or perceived by an officer to give him a probable cause to make an arrest or a search need not amount to evidence sufficient to convict.  State v. Delmondo, at 554.

6.    ["]While police officers are acting in concert and are keeping each other informed of the progress of a particular investigation, the knowledge of each is deemed to be the knowledge of all."  State v. Barnes, 58 Haw. 333, 336 (1977).

7.    A warrantless arrest may be valid if police have probable cause to arrest the defendant for a different though closely related offense.  See State v. Vance, 61 Haw. 291, 297 (1979).

In this case, the Court concludes that, based upon the totality of the circumstances, police had probable cause to stop and arrest the Defendant when the facts and circumstances within the police's knowledge and of which the police had reasonably trustworthy information were sufficient in themselves to warrant a person of reasonable caution in the belief that the Defendant committed the crimes of sexual assault and/or the closely related offense of assault.  Accordingly, this Court concludes that a reasonable person viewing the evidence would have a strong suspicion that the Defendant committed a crime, and thus, police properly arrested the Defendant based upon probable cause.

ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, Defendant's Motion to Suppress Confession is DENIED.

C.

Kahai filed a Motion for Reconsideration.  In denying the motion, the Circuit Court, explained in relevant part:

The primary argument I think that the defense is making here in this motion for reconsideration, which has been made before, is that neither [the CW] nor [K.T.] were credible or reliable witnesses on the night in question or during the early morning hours in question.

But the Court has reviewed their various statements to the police, some of which were correct, some of which were not correct.  But I think what is essentially demphasized [sic] by the defense is the strength of the corroborative evidence which the police observed prior to the defendant's arrest, and speaking in particular, of the blood and the clothing along the dirt pathway identified as the scene of the crime when they went out to go to the area where [the CW] described where the assault took place.

I'm talking about the men's shorts, which it appeared someone stepped out of and left on the ground of his garage with dirt on them, and that was testified to by one of the officers who walked into the carport, that there was dirt on the shorts.

12

> And the observation of blood, or what appeared to be blood on the tank top and T-shirt that were, I think, hanging on some sink that was in the carport in plain view, and the light was on in the carport at about three something in the morning with the defendant's car in the driveway.

## DISCUSSION

### I.

Kahai argues that the Circuit Court erred in denying his Motion to Suppress Confession because he claims that the police lacked probable cause to arrest him and therefore his confession should have been suppressed as the fruit of an unlawful arrest. Kahai concedes that the police had probable cause to believe the CW had been attacked. He contends, however, that the police lacked probable cause to believe that he was the person responsible for the attack. As explained below, we reject Kahai's claim that the police lacked probable cause to arrest him.

### A.

### 1.

We review a trial court's ruling on a motion to suppress evidence, including the trial court's determination of whether probable cause to arrest exits, *de novo* to determine whether the ruling was right or wrong. State v. Kaleohano, 99 Hawai'i 370, 375, 56 P.3d 138, 143 (2002); State v. Maganis, 109 Hawai'i 84, 86, 123 P.3d 679, 681 (2005).

> The proponent of the motion to suppress has the burden of establishing, by a preponderance of the evidence, that the statements or items sought to be excluded were unlawfully secured and that his or her right to be free from unreasonable searches or seizures was violated under the fourth amendment to the United States Constitution and article I, section 7 of the Hawai'i Constitution.

Kaleohano, 99 Hawai'i at 375, 56 P.3d at 143 (2002). We review a trial court's findings of fact under the clearly erroneous standard, and its conclusions of law *de novo*. Id.

### 2.

The Hawai'i Supreme Court has used different formulations to describe the probable cause standard. In

Maganis, the supreme court basically adopted the standard set forth in Hawaii Revised Statutes (HRS) § 803-5(b) (1993)[3] in describing probable cause as follows:

> Probable cause exists when the facts and circumstances within one's knowledge and of which one has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been committed. *This requires more than a mere suspicion but less than a certainty.* This standard has two components. The first sentence describes the standard for determining the presence of probable cause. The second sentence describes the quantum of proof necessary to satisfy the standard.

Maganis, 109 Hawai'i at 86, 123 P.3d at 681 (internal quotation marks, citations, and footnote omitted; emphasis in original). The supreme court also has held that probable cause means or is established by "a state of facts as would lead a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused." State v. Atwood, 129 Hawai'i 414, 419, 301 P.3d 1255, 1260 (2013) (internal quotation marks and citation omitted); State v. Naeole, 80 Hawai'i 419, 424, 910 P.2d 732, 737 (1996) (internal quotation marks and citation omitted).[4]

The United States Supreme Court has observed that the probable cause standard "is a practical, nontechnical conception" that deals "with probabilities" that are not technical, but are "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Illinois v. Gates, 462 U.S. 213, 231 (1983) (internal quotation

---

[3] HRS § 803-5(b) provides in relevant part: "[A] police officer has probable cause to make an arrest when the facts and circumstances within the officer's knowledge and of which the officer has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that a crime has been or is being committed."

[4] See also Hawai'i Rules of Penal Procedure Rule 5(c)(2)(ii) (2014) (requiring that for a defendant to waive preliminary hearing on a felony complaint, he or she must sign a written statement acknowledging "[t]hat in order to establish probable cause the State must offer sufficient evidence to 'lead a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion' that the defendant has committed the felony charged or an included felony[.]"

14

marks and citations omitted). "[P]robable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules." Id. at 232.

The Hawaiʻi Supreme Court has stated: "[P]robable cause is generally based upon a combination of factors, which together form a sort of mosaic, of which any one piece by itself often might not be enough to constitute probable cause, but which, when viewed as a whole, does constitute probable cause." State v. Chong, 52 Haw. 226, 231, 473 P.2d 567, 571 (1970). The probable cause determination is based on the totality of the circumstances. State v. Ferrer, 95 Hawaiʻi 409, 431, 23 P.3d 744, 766 (App. 2001). Among the relevant circumstances for the court to consider are the training and experience of the investigating police officers. See Naeole, 80 Hawaiʻi at 424, 910 P.2d at 737; Chong, 52 Haw. at 232, 473 P.2d at 571; State v. Spillner, 116 Hawaiʻi 351, 358, 173 P.3d 498, 505 (2007) (noting that due to police officers' experience and specialized training, they are able to draw inferences from and make deductions about "the cumulative information available to them that 'might elude an untrained person'" (citation omitted)).

B.

Based on the evidence presented at the hearing on Kahai's Motion to Suppress Confession, we conclude that there was probable cause to arrest Kahai. At the time Officer Gomez arrested Kahai, the following facts and circumstances of which Officer Gomez had reasonably trustworthy information, were known to him: (1) the CW had been a victim of physical assault, which resulted in a large laceration to her head and extensive bleeding, and left her with a large of amount of dried blood, as well as grass, dirt, and leaves in her hair; (2) when first interviewed by the police, the CW was visibly upset, was crying, was disoriented, and had a strong odor of liquor; (3) at that time, the CW was only wearing a shirt, had a sheet wrapped around her waist but was otherwise naked from the waist down, and was

15

barefoot; (4) the CW reported that she had been out drinking with Kahai and her friend K.T.; (5) at Kahai's residence, which Officer Gomez visited a short time after the CW's initial interview, men's shorts, with dirt on them, that appeared to have been "stepped out of" were found on the carport floor and a T-shirt with dark red stains that appeared to be blood was seen hanging over a utility sink; (6) the CW was re-interviewed and reported that she believed she had been sexually assaulted, because she was menstruating and noticed her tampon had been "shoved all the way up there"; (7) the CW, who was now calmer and more coherent, recalled going alone with Kahai to his residence, feeling uncomfortable there, leaving Kahai's residence and attempting to walk home, and being attacked in the area of Waiehu Beach Road and Lower Waiehu Beach Road; (8) while not sure who was responsible for the attack, the CW stated several times that "It must have been Brandon"; (9) Kahai was the last person known to have been with the CW before she was attacked; (10) on the shoulder of Waiehu Beach Road, Officer Gomez found a women's high heel shoe and a puddle of blood next to the second shoe; (11) down a nearby trail that led to some bushes and brush, Officer Gomez found blood-stained cardboard and carpet, a pair of jeans and women's underwear turned inside out, and lots of debris, shredded wood, leaves, and dirt, similar to the debris in the CW's hair earlier that morning; (12) while at this apparent crime scene, Officer Gomez saw Kahai drive by, driving slowly and staring at the police without paying attention to the road, and then saw Kahai drive by again a short time later, coming from the opposite direction; and (13) when Officer Gomez approached Kahai after stopping his car, Kahai was very nervous, and Kahai was shaking, clenching the steering wheel, and sweating profusely.

We conclude that the facts and circumstances within Officer Gomez's knowledge and of which he had reasonably trustworthy information were sufficient to warrant a person of reasonable caution to believe that Kahai had sexually and physically assaulted the CW.  Because Officer Gomez had probable

cause to arrest Kahai for sexual assault by strong compulsion as well as second-degree assault, Officer Gomez's arrest of Kahai was lawful. See State v. Vance, 61 Haw. 291, 297-98, 602 P.2d 933, 938-39 (1979) (holding that an arrest is valid if the police have probable cause to arrest the defendant for an offense closely related to the one for which the defendant was arrested). Accordingly, Kahai's confession was not the fruit of an unlawful arrest, and the Circuit Court correctly denied Kahai's Motion to Suppress Confession.

C.

Kahai argues that probable cause was lacking because the information obtained from the CW was not reasonably trustworthy, and therefore, there was insufficient evidence to warrant a person of reasonable caution to believe that Kahai was responsible for the assault on the CW. We disagree.

The CW informed the police that she had been physically assaulted and believed she had been sexually assaulted; gave the police the approximate location of the assault; told them that immediately prior to the assault, she been with Kahai at his residence and decided to walk home, in the early morning when it was still dark, because she felt uncomfortable; and repeatedly expressed her belief that the perpetrator "must have been" Kahai. Although the CW, particularly in the initial interview, appeared to be upset, disoriented, and intoxicated, the police did not simply rely on the CW's uncorroborated recollection of what had happened. Instead, the key information provided by the CW, including her belief that Kahai was the perpetrator, was corroborated by other evidence gathered during the investigation.

The CW's statement that she had been physically assaulted was corroborated by the observation by the police of the obvious injuries she had sustained, and she explained her belief that she had been sexually assaulted by her subsequent discovery of the location of her tampon. The CW's information regarding the physical and sexual assault, and the approximate location of the assault, was further corroborated by Officer

17

Gomez's discovery of high-heel shoes and a fresh puddle of blood on the shoulder of Waiehu Beach Road, and his discovery nearby of blood-stained cardboard and carpet, with jeans and women's underwear turned inside out, and debris that matched the debris the police saw in the CW's blood-matted hair. The CW's belief that Kahai must have been the perpetrator was corroborated by the discovery of shorts with dirt on them and a blood-stained T-shirt at Kahai's residence; the fact that he was the last person known to have been with the CW prior to the assault; Kahai's return to the crime scene, and his strange behavior in staring at the police then turning around for another look, which indicated an abnormal interest in the police investigation and a guilty conscience, and served to link Kahai to the assault of the CW; and Kahai's extreme nervousness, shaking and sweating profusely, when stopped by Officer Gomez.[5]

Although Officer Gomez may not have had definitive proof that Kahai has sexually and physically assaulted the CW before placing Kahai under arrest, the information provided by the CW, as corroborated by and combined with the other evidence gathered during the investigation, was sufficient to "warrant a person of reasonable caution to believe" that Kahai had sexually and physically assaulted the CW. See Maganis, 109 Hawai'i at 86, 123 P.3d at 681. Each individual piece of evidence gathered by the police "might not [have been] enough to constitute probable cause," but together the evidence gathered "form[ed] a sort of mosaic, . . . which, when viewed as a whole," constituted probable cause to arrest Kahai. See Chong, 52 Haw. at 231, 473 P.2d at 571.

D.

In addition to generally challenging the Circuit Court's determination of probable cause, Kahai challenges certain

---

[5] We note that the Circuit Court discounted the significance of, and did not rely on, Officer Gomez's observation of Kahai's extreme nervousness when Kahai was stopped. However, we may consider such evidence given the de novo standard of review.

of the Circuit Court's findings of fact (FOF) and conclusions of law (COL). We conclude that these challenges do not affect our determination that Officer Gomez had probable cause to arrest Kahai.

1.

Citing the Hawai'i Supreme Court's decision in Maganis, Kahai contends that the Circuit Court's COL 2 misstates the probable cause standard. The Circuit Court stated in COL 2 that: "[p]robable cause has been established when it can be said that a reasonable person viewing the evidence would have a strong suspicion that a crime had been committed." Kahai contends that the Circuit Court's use of the "strong suspicion" standard impermissibly reduces the quantum of proof required for probable cause. We disagree.

Citing United States Supreme Court cases, this court had concluded in our Maganis opinion that probable cause required "more than a bare suspicion or possibility that the defendant committed a crime" but less than "proof by a preponderance of the evidence" or "proof that the defendant's guilt is more likely than not." State v. Maganis, 109 Hawai'i 89, 93, 123 P.3d 684, 688 (App. 2005). On certiorari review, the Hawai'i Supreme Court concluded that our formulation of the probable cause standard had "water[ed] down" the standard. Maganis, 109 Hawai'i at 88, 123 P.3d at 683. The supreme court instead opted for a more flexible standard for probable cause that requires "'more than a mere suspicion but less than a certainty[.]'" Id. ("We believe that the probable cause standard of requiring 'more than a mere suspicion but less than a certainty' provides the flexibility necessary in determining probable cause, and preserves the necessary balance between the competing interests of law-abiding citizens and law enforcement.")

"Strong suspicion" is "more than a mere suspicion but less than a certainty." Therefore contrary to Kahai's claim, the Circuit Court's reference to "strong suspicion" in articulating the probable cause requirement does not conflict with the supreme

19

court's decision in Maganis. Indeed, as previously noted, the supreme court has also used the term "strong suspicion" in formulating the probable cause standard. See Atwood, 129 Hawai'i at 419, 301 P.3d at 1260; Naeole, 80 Hawai'i at 424, 910 P.2d at 737; see also Hawai'i Rules of Penal Procedure (HRPP) Rule 5(c)(2)(ii).

In any event, in addition to its reference to "strong suspicion" in COL 2, the Circuit Court in COL 3 fully stated the standard for probable cause set forth in HRS § 803-5(b), which was essentially adopted by the supreme court in Maganis. We have applied the supreme court's Maganis standard in conducting our de novo review and in concluding that Officer Gomez had probable cause to arrest Kahai. Accordingly, Kahai's challenge to COL 2 does not advance his claim on appeal or provide a basis for relief.

2.

The same is true of Kahai's challenges to FOF 3, 4, and 12. Kahai challenges FOF 3 because it refers to information provided by the CW. However, as previously noted, the key information provided by the CW was corroborated by other evidence uncovered during the investigation, and therefore, Kahai's challenge to FOF 3 is without merit.

Kahai challenges the statement in FOF 4 that "[a]lthough it wasn't true, [K.T.] also informed the officer that neither [the CW] or [Kahai] was intoxicated at that time." Although this finding was not supported by any evidence presented at the hearing on Kahai's Motion to Suppress Confession, it was not relevant to the determination of probable cause. Thus, the Circuit Court's error in making this finding was harmless.

Kahai challenges the statement in FOF 12 that "[a]t all times during the entire investigation, police were, acting in concert by communicating with each other via police radio and in person[.]" The evidence presented at the hearing showed that the main officers involved in the investigation, Officers Gomez, Galarza, and Gilroy, were acting in concert and communicating

20

with each other during the investigation.[6] Accordingly, there was substantial evidence to support the Circuit Court's finding that the police were acting in concert by communicating with each other, and this finding was not clearly erroneous. In any event, in determining that Officer Gomez had probable cause to arrest Kahai, it is not necessary for us to rely on any information held by the other officers that was not communicated to Officer Gomez. There was probable cause to arrest Kahai based on the information Officer Gomez testified he personally knew and which he testified had been communicated to him by Officers Galarza and Gilroy.

II.

In accepting Kahai's no contest pleas, the Circuit Court agreed to bind itself to the parties' agreed-upon sentences, including a ten year sentence as to Count 4. Kahai argues that the Circuit Court erred in failing to comply with its sentencing commitment and instead sentenced Kahai to twenty years of imprisonment. The State concedes error on this point and we agree with this concession of error.

HRPP Rule 11 permitted the Circuit Court to bind itself to the parties' plea agreement. See HRPP Rule 11(e)(1) and (e)(3) (2007). The Circuit Court bound itself to the parties' plea agreement that provided for a ten-year sentence of imprisonment as to Count 4. Accordingly, the Circuit Court erred in failing to sentence Kahai to the agreed-upon ten-year term on Count 4.

CONCLUSION

Based on the foregoing, we vacate the portion of the Circuit Court's Judgment that imposed the sentence on Kahai as to Count 4, and we remand the case with directions that the Circuit

---

[6] Kahai correctly notes that no specific evidence was presented that the officers had communicated via police radio. However, the Circuit Court's reference to communication via police radio in its finding was immaterial. Officer Gomez testified that he had been working in concert with Officers Galarza and Gilroy and that those officers had relayed information to him during the investigation.

Court impose a ten-year term of imprisonment on Count 4.  We affirm the Circuit Court's Judgment in all other respects.

DATED:  Honolulu, Hawai'i, October 31, 2014.

On the briefs:

Summer M.M. Kupau
Deputy Public Defender
for Defendant-Appellant

Richard K. Minatoya
Deputy Prosecuting Attorney
County of Maui
for Plaintiff-Appellee

Chief Judge

Associate Judge

Associate Judge

22